UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| KELLY BAUGH, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | No. 1:22-cv-02012-JMS-TAB |
| *vs.* | ) | |
| | ) | |
| FOR BARE FEET, LLC, | ) | |
| | ) | |
| *Defendant.* | ) | |

## ORDER

Plaintiff Kelly Baugh was the Chief Executive Officer of Defendant For Bare Feet, LLC ("FBF") and has initiated this litigation related to her treatment during her employment and her ultimate resignation. Specifically, she asserts discrimination and retaliation claims under the Age Discrimination in Employment Act, 29 U.S.C. § 621, *et seq.* ("ADEA"); discrimination and retaliation claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* ("Title VII"); and state law claims for violation of Ind. Code § 32-36-1-1, *et seq.* and invasion of privacy. [Filing No. 25.] FBF has filed a Motion for Partial Summary Judgment, [Filing No. 46], which is now ripe for the Court's consideration.

## I.
### STANDARD OF REVIEW

A motion for summary judgment asks the Court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and, instead, the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). On summary judgment, a party must show the Court what evidence it has that would convince a trier of fact to accept its version of the events. *Johnson v. Cambridge Indus.*, 325 F.3d 892, 901 (7th Cir. 2003). "'Summary judgment is not a time to be

coy.'" *King v. Ford Motor Co.*, 872 F.3d 833, 840 (7th Cir. 2017) (quoting *Sommerfield v. City of Chicago*, 863 F.3d 645, 649 (7th Cir. 2017)).  Rather, at the summary judgment stage, "[t]he parties are required to put their evidentiary cards on the table." *Sommerfield*, 863 F.3d at 649.

The moving party is entitled to summary judgment if no reasonable fact-finder could return a verdict for the non-moving party.  *Nelson v. Miller*, 570 F.3d 868, 875 (7th Cir. 2009).  The Court views the record in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor.  *Darst v. Interstate Brands Corp.*, 512 F.3d 903, 907 (7th Cir. 2008).  It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder.  *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 630 (7th Cir. 2011).

Each fact asserted in support of or in opposition to a motion for summary judgment must be supported by "a citation to a discovery response, a deposition, an affidavit, or other admissible evidence." S.D. Ind. L.R. 56-1(e).  And each "citation must refer to a page or paragraph number or otherwise similarly specify where the relevant information can be found in the supporting evidence." *Id.*  The Court need only consider the cited materials and need not "scour the record" for evidence that is potentially relevant.  *Grant v. Trustees of Ind. Univ.*, 870 F.3d 562, 572-73 (7th Cir. 2017) (quotations omitted); *see also* Fed. R. Civ. P. 56(c)(3); S.D. Ind. L.R. 56-1(h). Where a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact, the Court may consider the fact undisputed for purposes of the summary judgment motion.  Fed. R. Civ. P. 56(e)(2).

In deciding a motion for summary judgment, the Court need only consider disputed facts that are material to the decision.  A disputed fact is material if it might affect the outcome of the suit under the governing law.  *Hampton v. Ford Motor Co.*, 561 F.3d 709, 713 (7th Cir. 2009).  In

other words, while there may be facts that are in dispute, summary judgment is still appropriate if those facts are not outcome determinative. *Harper v. Vigilant Ins. Co.*, 433 F.3d 521, 525 (7th Cir. 2005). Fact disputes that are irrelevant to the legal question will not be considered. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## II.
### EVIDENTIARY ISSUES

The parties have raised several evidentiary issues in their briefs on FBF's Motion for Partial Summary Judgment, which the Court discusses first as their resolution informs the evidence the Court will consider in deciding the Motion.

### A. Ms. Baugh's "Disputes" Relating to FBF's Statement of Disputed Material Facts

In her response to FBF's Motion for Partial Summary Judgment, Ms. Baugh lists 14 facts from FBF's Statement of Undisputed Material Facts that she argues the Court should not consider. For the majority of her disputes, Ms. Baugh argues that the fact set forth by FBF is "immaterial" and "not potentially determinative of the motion for summary judgment." [Filing No. 63 at 2-6.] The Court finds that many of the facts which Ms. Baugh contends the Court should not consider are, indeed, relevant – either to Ms. Baugh's qualifications as Chief Executive Officer ("CEO") of FBF, what she was aware of regarding her future as FBF's CEO, the role of other individuals in FBF, the changes to Ms. Baugh's duties or salary while she was CEO, and issues FBF claims it had regarding her performance. Consequently, the Court has included those facts in its Statement of Facts below and, treating Ms. Baugh's disputes as objections, **OVERRULES** her Objections. Other facts which Ms. Baugh disputes, however, are either not relevant to the Motion for Partial Summary Judgment or are contradicted by evidence submitted by Ms. Baugh. In those cases, the Court **SUSTAINS** Ms. Baugh's Objections and has not included those facts in its Statement of Facts below.

### B.  FBF's Objections to Ms. Baugh's Statement of Additional Material Facts

In its reply brief, FBF objects to several of the facts that Ms. Baugh lists in the Statement of Additional Material Facts in her response brief.  [Filing No. 68 at 6-9.]  Of the 15 statements to which FBF objects, the Court **SUSTAINS** FBF's Objections to ten of them (statements 4, 5, 6, 8, 9, 10, 12, 13, 14, and 15) because the statements are not relevant to the Court's ruling.  For the remaining five statements (statements 1, 2, 3, 7, and 11), the Court **OVERRULES** FBF's Objections and explains its rulings in footnotes as those statements appear in the below Statement of Facts.

### III.
#### STATEMENT OF FACTS

The Court notes at the outset that FBF does not provide a coherent chronology of the facts in its brief in support of its Motion for Partial Summary Judgment.  Its Statement of Undisputed Material Facts often jumps around chronologically and leaves out basic context information – of which the Court does not have knowledge – that makes the timeline of events difficult to discern. While the Court is not obligated to "scour the record" for relevant evidence, *Grant*, 870 F.3d at 572-73, it often needed to do so here in evaluating the Motion for Partial Summary Judgment just to be able to determine the chronology of events upon which Ms. Baugh bases her claims.  This has made its review of the Motion unnecessarily cumbersome and time-consuming.  That said, the Court sets forth the following Statement of Facts pursuant to the standard of review detailed above and with its evidentiary rulings incorporated.  The facts stated are not necessarily objectively true, but as the summary judgment standard requires, the undisputed facts and the disputed admissible evidence are presented in the light most favorable to "the party against whom the motion under consideration is made." *Premcor USA, Inc. v. Am. Home Assurance Co.*, 400 F.3d 523, 526-27 (7th Cir. 2005).

**A.  For Bare Feet, Inc.**

For Bare Feet, Inc. ("FBF, Inc.") was a manufacturer and retailer of socks and accessories. [Filing No. 25 at 2.]  At some point prior to December 2018, the decision was made to sell FBF, Inc.  [Filing No. 46-1 at 3.]  Ms. Baugh was in charge of facilitating the sale.  [Filing No. 46-1 at 6.]  Ms. Baugh did not have acquisition experience, but FBF hired a company to pursue companies interested in an acquisition.  [Filing No. 46-1 at 6.]  FBF Investment – owned by brothers Mike and Bobby Taglich – ultimately acquired FBF, Inc. and it became FBF, the Defendant in this case. [Filing No. 46-1 at 27.]

**B.  Ms. Baugh's Position at FBF**

Ms. Baugh became FBF's CEO on December 27, 2018.  [Filing No. 46-2 at 4.]  She earned a base salary and benefits according to an Employment Agreement she entered into with FBF. [Filing No. 46-1 52-53; Filing No. 46-2 at 4; Filing No. 46-3.]  As the CEO of FBF, Ms. Baugh did not have a supervisor.  [Filing No. 46-2 at 5.]  She was responsible for running the day-to-day operations of FBF and earned a salary of $220,000 per year, with a target bonus of 37.5% of her salary, throughout her time as FBF's CEO.  [Filing No. 46-2 at 5; Filing No. 46-3 at 2.]

Ms. Baugh understood that upon acquisition, the business model was to continue FBF's operations and to grow its earnings before interest, taxes, depreciation, and amortization so that FBF could be sold, and that a new CEO would be hired in five to eight years.  [Filing No. 46-1 at 16-17.]  It was explained to Ms. Baugh that the CEO of the combined company, after a sale, would need expertise and experience in pursuing acquisition opportunities and integrating acquisitions. [Filing No. 46-2 at 10-11.]

**C. FBF's Structure**

FBF was owned by FBF Investment, which was managed by a Board of Directors (the

"Board"). [Filing No. 46-1 at 27.]  Ms. Baugh was on the Board, along with six other individuals.

[Filing No. 46-2 at 5.]  The President of FBF Investment, Will Morris, had the authority to carry

on the business of FBF Investment, including acting on behalf of FBF Investment in its role as

manager of FBF and managing FBF operations.  [Filing No. 46-2 at 5.]  Mike and Bobby Taglich

were not members of the Board and were not involved in the day-to-day operations of FBF. [Filing

No. 46-1 at 27-28.]

**D.     The Celebratory Dinner**

In early 2019, there was a celebratory dinner to commemorate the Taglich Brothers'

purchase of FBF, Inc. and the formation of FBF (the "Celebratory Dinner").  [Filing No. 46-1 at

21.]  Ms. Baugh met Mike Taglich for the first time when she picked the Taglich Brothers up at

the airport for the Celebratory Dinner. [Filing No. 46-1 at 22.]  Bobby Taglich immediately said

"I'll apologize for my brother now," before Mike Taglich had said anything.  [Filing No. 46-1 at

22-23.][1]  Ms. Baugh found Mike Taglich to be "a very robust individual when you meet him and

very vocal," "a whole personality that is extremely large," and someone who "says anything that

_____

[1] FBF objects to this statement as hearsay, arguing that it is offered to "prove the truth of the matter asserted, namely that Mike Taglich was rude and engaged in behavior that required apologies," and also objects on the basis that the statement is immaterial.  [Filing No. 68 at 6.]  Ms. Baugh responds that this statement is excepted from the rule against hearsay as either a present sense impression or a statement of then-existing mental, emotional, or physical condition.  [Filing No. 75 at 4.]  Fed. R. Evid. 803(3) provides in relevant part that "[a] statement of the declarant's then-existing state of mind (such as motive, intent, or plan) or emotional…condition (such as mental feeling, pain, or bodily health)" is not hearsay.  The Court finds that Bobby Taglich's statement was a statement of his own state of mind – his intent to apologize and warn Ms. Baugh of his brother's behavior – and is not considered hearsy.  Fed. R. Evid. 803(3).  Further, the statement is relevant and material because it touches on the relationship between Ms. Baugh and the Taglich Brothers.  The Court **OVERRULES** FBF's Objection.

comes to mind." [Filing No. 46-1 at 22-23.]  Mike Taglich made inappropriate jokes, but Ms. Baugh is "pretty thick-skinned" and "brushed it off." [Filing No. 46-1 at 23-24.]  Mike Taglich's jokes and behavior were "on the line of offensive," but Ms. Baugh "wasn't completely put off by it." [Filing No. 46-1 at 25-26.]

FBF's executive team was upset on the evening of the Celebratory Dinner because Mike Taglich said to the female Vice President of Bell Capital, who had funded the purchase of FBF, Inc., "something to the effect of must be nice to be the most beautiful woman in the room, must be nice to be so hot."[2] [Filing No. 46-1 at 19.]

### E.  The Investors Meeting

In the late spring of 2019, the Taglich Brothers held an investors meeting in New York City for all of the companies that were owned by them (the "Investors Meeting").  [Filing No. 46-1 at 29-30.]  Hundreds of people attended, including the CEOs of all of the companies owned by the Taglich Brothers.  [Filing No. 46-1 at 30-32.]  Ms. Baugh was the only female CEO and was set to give a presentation regarding FBF.  [Filing No. 46-1 at 33-34.]  When Mike Taglich introduced her to the hundreds of attendees, he said, "we have a new company, [and] talked about the company a little bit," and then said "this is our new blonde bombshell CEO, Kelly Baugh."

---

[2] FBF objects to this statement, arguing that it contains hearsay, is presented without context and "without any testimony from the person allegedly making the statement as well as the recipient of the alleged statement," and is immaterial because it "is not a fact that could allow a fact-finder to decide against the movant."  [Filing No. 68 at 6.]  Ms. Baugh responds that the statement is a present-sense impression and an admission of a party opponent, so falls within the exceptions to the hearsay rule.  [Filing No. 75 at 2.]  She notes that Mike Taglich was the owner of FBF when he made the statement and that the statement was made within the scope of his agency or employment at the Celebratory Dinner.  [Filing No. 75 at 3.]  Mike Taglich's statement was made by a party – as the owner of the company that owned FBF – and was made "on a matter within the scope of" his relationship as FBF's owner, so is not hearsay.  Fed. R. Evid. 801(d)(2)(D).  Further, it is relevant to Ms. Baugh's discrimination claim based on a hostile work environment.  The Court **OVERRULES** FBF's Objection.

[Filing No. 46-1 at 34.]  After Mike Taglich made that comment, Ms. Baugh's face was beet red, she was sweating, and she was extremely uncomfortable.  [Filing No. 62-2 at 20.]  She "had a hard time recovering and tried to cover it up."  [Filing No. 62-2 at 20.]  Ms. Baugh did not complain about Mike Taglich's introduction of her because she did not feel comfortable bringing it up since he was the owner of the company that had just purchased FBF and she was frightened.  [Filing No. 62-2 at 24.]  After her presentation, a female investor at the Investors Meeting said to her, "it's about time Mike hired a female."  [Filing No. 62-2 at 20.][3]

### F.  Ms. Baugh's Other Interactions With Mike Taglich

Ms. Baugh's interactions with Mike Taglich were fairly limited after the Investors Meeting, including occasional calls and texts regarding FBF's business, a September 2020 Zoom stakeholders meeting, and a September 2021 in-person meeting.  [Filing No. 46-1 at 39.]  During those interactions, he did not say anything offensive to her.  [Filing No. 46-1 at 39-40.]

### G.  Ms. Baugh's Encounters With Mr. Morris

In early 2021, Mr. Morris and Ms. Baugh participated in a conference call with PRO Compression ("PRO"), a company that the Taglich Brothers were interested in acquiring.  [Filing No. 46-1 at 61.]  On the conference call, Mr. Morris asked Ms. Baugh to disclose to PRO representatives FBF's royalty percents and the amount it paid for an NFL contract along with other "specific detailed information."  [Filing No. 46-1 at 61.]  Ms. Baugh explained that she was not

---

[3] FBF objects to this statement as hearsay, arguing that it is presented for the truth of the matter asserted – that Mike Taglich does not hire females – and notes that Ms. Baugh does not disclose the name of the individual who said it.  [Filing No. 68 at 7.]  FBF also asserts that the statement is immaterial.  [Filing No. 68 at 6-7.]  Ms. Baugh responds that the statement is not hearsay because it is a statement of then-existing mental feeling or thought.  [Filing No. 75 at 4-5.]  The Court finds that the statement is not hearsay under Fed. R. Evid. 803(3) as a statement of the declarant's then-existing mental feeling – that it was about time that Mike Taglich hired a female – and is material to Ms. Baugh's sex discrimination claim.  It **OVERRULES** FBF's Objection.

able to disclose that information because that would constitute breach of FBF's contract with the NFL, which accounted for over 50% of FBF's business.  [Filing No. 46-1 at 61-62.]  Mr. Morris proceeded to divulge the information on the conference call anyway, which Ms. Baugh found condescending.  [Filing No. 46-1 at 61-64.]  The participants on the conference call laughed at Ms. Baugh when Mr. Morris commented that she was "impossible and difficult."  [Filing No. 62-1 at 2; Filing No. 62-2 at 37.]  Mr. Morris did not pressure any males on the call to divulge the royalty information even though it was in their possession.[4]  [Filing No. 62-1 at 2.]  Later, when Ms. Baugh presented information regarding the reporting of royalties for E-commerce to PRO to Mr. Morris, he did not believe that the information she presented was correct, "treated [her] differently than other team members [and] board members," used a "belittling" tone of voice, and was "derisive."  [Filing No. 46-1 at 62-63.]

Mr. Morris decided to have executive members attend Board meetings to field questions and present information, which Ms. Baugh felt was discriminatory towards her.  [Filing No. 46-1 at 74.]  During a Board meeting, Mr. Morris asked Ms. Baugh a question and was not satisfied with her answer.  [Filing No. 46-1 at 65.]  Another Board member, Ron Berge, then asked the question multiple times in different ways "to the point it was an interrogation," and then another Board member spoke up and said "I think she's answered the question, I think she's got it."  [Filing No. 46-1 at 65.]  Ms. Baugh found the experience demeaning.  [Filing No. 46-1 at 66-67.]  During other Board meetings, Mr. Morris would ask Ms. Baugh a question "over and over and over, and

---

[4] FBF objects to a statement in Ms. Baugh's response that "[Mr.] Morris degraded Ms. Baugh based on the fact she is female."  [Filing No. 68 at 7.]  The Court **SUSTAINS** FBF's Objection and has not included this portion of the statement in its Statement of Facts.  Whether a reasonable factfinder could infer that Mr. Morris's actions were because Ms. Baugh was a female is discussed by the Court in the Discussion section below.

then ask a male counterpart, they would give an answer, and he would, like, okay, we can move on." [Filing No. 46-1 at 72-73.][5]

Ms. Baugh felt that Mr. Morris treated her differently than her male counterparts and she asked him why. [Filing No. 58-1 at 40.] He told her he "f***ing hate[d]" her. [Filing No. 58-1 at 40.] Mr. Morris also screamed at her and told her on occasion that she was "so difficult" and "make[s] everything impossible." [Filing No. 46-1 at 74-75; Filing No. 46-1 at 81-82.]

**H. The Golf Outing**

In 2021, a Board meeting was held at a golf club that Eric Smith, a co-CEO of PRO, belonged to. [Filing No. 58-1 at 42.] The Board meeting was part of an effort to merge FBF and PRO. [Filing No. 58-1 at 43.] Every male Board member was invited to play golf after the meeting, but not Ms. Baugh. [Filing No. 58-1 at 42.] She would not have known about it, except that one of the attendees at the Board meeting commented that he could not wait to get out on the golf course. [Filing No. 58-1 at 42.]

**I. Ms. Baugh's Duties at FBF Change**

Prior to September 2021, Ms. Baugh was in charge of FBF's E-commerce business. [Filing No. 58-1 at 38.] The revenue coming from FBF's E-commerce efforts was small compared to the potential and expected revenue from the core wholesale business. [Filing No. 46-2 at 14-15.] Following a joint meeting of the FBF Investment Board and the PRO Investment Board in August

---

[5] FBF objects to the statement in Ms. Baugh's response brief that "[Mr.] Morris would demean Ms. Baugh based off her sex by asking her questions multiple different times as opposed to male executive team members." [Filing No. 68 at 7.] It argues that the conclusory statement that Mr. Morris would demean Ms. Baugh "based on her sex" is inadmissible. [Filing No. 68 at 7.] Ms. Baugh argues that the jury can decide whether the statement is "an inference from a specific fact." [Filing No. 75 at 6.] The Court **SUSTAINS** FBF's Objection and does not include the portion of the statement "based on her sex." Whether a reasonable factfinder could infer that Mr. Morris's actions were because Ms. Baugh is a female is discussed by the Court in the Discussion section below.

2021, Mr. Morris discussed FBF's E-commerce initiative with various Board members and it was decided that Ms. Baugh would be asked to focus on getting FBF's core licensing business stable and back to being profitable, while Mr. Smith directed FBF's E-commerce effort.  [Filing No. 46-2 at 14-15.]  PRO was exclusively an E-commerce business, and Mr. Smith led the E-commerce efforts there.  [Filing No. 46-1 at 99; Filing No. 46-5 at 6.]

In September 2021, Ms. Baugh was informed that Mr. Smith would take over running FBF's E-commerce efforts and that she would focus on growing FBF's core wholesale business. [Filing No. 46-2 at 14-15.]  Ms. Baugh was to continue on as CEO of FBF.  [Filing No. 46-2 at 14-15.]  A Board member, Mr. Berge, told Ms. Baugh that Mr. Morris wanted to reassign E-commerce responsibilities to Mr. Smith because he was "younger, fashionable, [and] more hip." [Filing No. 58-1 at 38.][6]  In the meantime, Ms. Baugh had presented a proposal for E-commerce and a month later, Mr. Smith presented the exact same proposal that Ms. Baugh had put together. [Filing No. 58-1 at 39.]  FBF increased its ad spending for E-commerce significantly after Mr. Smith took over, using the same proposal that Ms. Baugh and her team had created.  [Filing No. 62-2 at 44; Filing No. 62-5 at 42.]

---

[6] FBF objects to this statement, arguing that it is double hearsay as a statement made by Mr. Morris to Mr. Berge and then to Ms. Baugh and is being offered to prove the truth of the matter asserted. [Filing No. 68 at 7-8.]  Ms. Baugh responds that the statement is that of a party opponent because both Mr. Morris and Mr. Berge were members of FBF's Board and the statements were made within the scope of their agency or employment.  [Filing No. 75 at 9-10.; Filing No. 75 at 15.]  She also argues that the statement is evidence of intent or pretext, and so is admissible.  The Court finds that the statements are that of a party opponent and therefore do not constitute hearsay, let alone double hearsay.  Fed. R. Evid. 801(d)(2)(D).  Further, the statement is relevant to Ms. Baugh's sex discrimination claim based on disparate treatment.  Accordingly, it **OVERRULES** FBF's Objection.

### J.  Concerns Regarding Ms. Baugh's Leadership as CEO

Meanwhile, in the summer and fall of 2021, concerns existed regarding Ms. Baugh's leadership as CEO of FBF, including that: (1) under her leadership, FBF's financial performance was poor and continued to struggle; (2) she "was not easy to work with when interacting with any of the individuals from [PRO]"; (3) "her management style was difficult for others within FBF and a detriment to a business that was trying to grow"; (4) she was "rude to employees [and] third parties"; (5) her leadership style "was not conducive to the goals of the business"; (6) she "spent a large amount of time not on site, which impacted her ability to lead as the CEO" and "was spending less time at the company"; and (7) "the E-Commerce initiative was considered a failure under her direction."  [Filing No. 46-2 at 11-12.]  However, Ms. Baugh was not disciplined, never received specific verbal or written reprimands or warnings in the form of employment correction action, and was never placed on probation, demoted, given counseling statements, suspended, terminated, or asked to resign in lieu of termination.  [Filing No. 46-2 at 10.]

### K.  Ms. Baugh Is Told FBF Will Have a New CEO

After Mr. Smith was assigned FBF's E-commerce duties, Ms. Baugh was told that the plan was to combine FBF and PRO when the profitability of FBF had improved to a level that would allow FBF to refinance its debt and that a new CEO would be needed once the businesses were combined.  [Filing No. 46-2 at 10-11; Filing No. 46-5 at 14.]  In October of 2021, Mr. Morris informed Ms. Baugh in a telephone call that she would be replaced as the CEO of FBF when FBF and PRO combined, but that they were open to finding a different role for Ms. Baugh in the combined company.  [Filing No. 46-5 at 13-15.]

Subsequently, Ms. Baugh requested that Mr. Morris hold a conference with the FBF executive team to explain its decision to transition certain roles at FBF to Mr. Smith.  [Filing No.

46-5 at 16.] Mr. Morris confirmed to the executive team and to Ms. Baugh that FBF was replacing her as CEO. [Filing No. 46-5 at 16.] In early November of 2021, in concert with certain Board members, Mr. Morris hired an executive search firm to begin a search for a new CEO for FBF. [Filing No. 46-5 at 23.]

### L.  Ms. Baugh Files a Charge of Discrimination

On November 9, 2021, Ms. Baugh's counsel emailed a draft of a Charge of Discrimination to FBF's Board. [Filing No. 62-1 at 7-9.] On November 10, 2021, Ms. Baugh filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") (the "First Charge"). [Filing No. 46-6.] Ms. Baugh checked boxes on the Charge for sex and age discrimination. [Filing No. 46-6 at 1.]

### M. Ms. Baugh Resigns

In December 2021, Ms. Baugh sent an email to Mr. Morris notifying him that she was resigning from her employment with FBF. [Filing No. 46-5 at 24.] Mr. Morris reached out to Ms. Baugh to ask her to take another position after a new CEO was hired and when FBF and PRO combined, such as head of licensing, but Ms. Baugh did not express any interest in doing so. [Filing No. 46-2 at 10-11.] Ms. Baugh gave two weeks' notice, making her last day of employment January 12, 2022, but Mr. Morris determined that her last day would be January 5, 2022. [Filing No. 46-4 at 20-21.]

John Corrigan served as FBF's interim CEO until FBF hired Steve Smits as CEO. [Filing No. 62-4 at 9.] Mr. Smits' starting salary as CEO of FBF was $300,000, with a target bonus of 60% of his salary. [Filing No. 62-7 at 1; Filing No. 62-7 at 5-6.]

### N.  Ms. Baugh Files a Second Charge of Discrimination

On August 18, 2022, Ms. Baugh filed another Charge of Discrimination with the EEOC (the "Second Charge").  [Filing No. 46-7.]  She checked the box for "retaliation," and claimed that she was notified regarding Mr. Smith assuming some of her duties and regarding FBF's search for a new CEO after she filed the First Charge.  [Filing No. 46-7.]

### O.  The Lawsuit

Ms. Baugh initiated this lawsuit on October 13, 2022, [Filing No. 1], and filed the operative Amended Complaint on April 19, 2023, [Filing No. 25].  She sets forth claims for: (1) discrimination based on disparate treatment and retaliation under the ADEA (Count I); (2) discrimination based on disparate treatment, discrimination based on a hostile work environment, and retaliation under Title VII (Count II); (3) violation of the statutory right of publicity under Ind. Code § 32-36-1-1, *et seq.* (Count III); and (4) common law invasion of privacy (Count IV).  [Filing No. 25 at 5-6.]  Ms. Baugh withdrew her discrimination claim under the ADEA in her Statement of Claims.  [Filing No. 41 at 1.]  FBF moves for summary judgment on Ms. Baugh's ADEA retaliation claim, her sex discrimination claim based on disparate treatment under Title VII, her sex discrimination claim based on hostile work environment under Title VII, and her retaliation claim under Title VII.  [Filing No. 47 at 2.]

**IV.**
**DISCUSSION**

### A.  Retaliation Claims

The Court notes at the outset that the parties discuss Ms. Baugh's retaliation claims under the ADEA and Title VII together.  The Court follows suit and does the same.

In support of its Motion for Partial Summary Judgment, FBF argues that Ms. Baugh's ADEA and Title VII retaliation claims fail because she did not suffer an adverse employment

- 14 -

action "prior to her voluntary resignation from FBF in January 2022." [Filing No. 47 at 27.]  It argues further that "even if the decision to hire a new CEO in the future or to begin a search for a new CEO were deemed to constitute [an] adverse employment action, [Ms.] Baugh still cannot establish her prima facie case of retaliation because those actions by FBF occurred prior to [Ms.] Baugh engaging in protected activity." [Filing No. 47 at 27.]  FBF contends that Ms. Baugh's only protected activity was when her counsel sent a draft of the First Charge to FBF's Board on November 9, 2021, but that "the decision to hire a new CEO to replace [Ms.] Baugh was made and communicated to [her] in or before September of 2021," the FBF executive committee was advised of the decision to replace Ms. Baugh as CEO in October 2021, and FBF had hired a search firm to identify CEO candidates before Ms. Baugh's counsel submitted the draft of the First Charge to the Board.  [Filing No. 47 at 27.]  FBF asserts that even if Ms. Baugh could establish a prima facie case of discrimination, it has articulated a legitimate, non-discriminatory reason for its actions – "[t]he ability to grow to allow for the company to be sold, in compliance with the business model." [Filing No. 47 at 24; Filing No. 47 at 28.]

In her response, Ms. Baugh argues that she was meeting legitimate employment expectations.  [Filing No. 63 at 32.]  She asserts that she filed her First Charge in November 2021 and that FBF "announced her removal and demotion at the [B]oard meeting on December 1, 2021" and "communicated to Ms. Baugh that she would be receiving a reduction in pay of over half of her current pay," and that "[o]n December 17, 2021, [Mr.] Morris requested to meet with Ms. Baugh to discuss the transition out of her CEO position indicating that her termination was imminent."  [Filing No. 63 at 29.]  Ms. Baugh argues further that she suffered an adverse employment action because she was constructively discharged from her position, stating that "[FBF's] argument that there was no intent to immediately replace [her] previous to her filing the

- 15 -

[First Charge] because [FBF] was not in a position…financially to sell and would not be for five years when the new CEO would be appointed is somewhat disingenuous." [Filing No. 63 at 31.] She contends that there are factual disputes regarding FBF's reasons for replacing her, noting that "several members of the [B]oard testified in their deposition[s] that Ms. Baugh was meeting legitimate performance expectations," and that she "was being replaced before any acquisition or sale and the search was already going great thirty…days after [she] filed her [First Charge] and [FBF] was notified of the [First Charge]." [Filing No. 63 at 25-26.] She argues that no other Taglich-owned companies had female CEOs, that FBF ultimately hired a male CEO, and that FBF has not presented facts showing that it had a legitimate, non-discriminatory reason for its actions. [Filing No. 63 at 33-34.]

In its reply, FBF notes that Ms. Baugh's only basis for her retaliation claim is "FBF's decision to replace her as the CEO," and that this decision took place before Ms. Baugh engaged in protected activity. [Filing No. 68 at 16.] FBF reiterates its arguments regarding the timing of informing Ms. Baugh that it would be replacing her as CEO. [Filing No. 68 at 16-17.] It argues further that Ms. Baugh has not presented evidence suggesting that FBF's reasons for its actions were a pretext for discrimination, and that those reasons were legitimate. [Filing No. 68 at 17-18.] Finally, FBF argues that Ms. Baugh has not demonstrated that she was constructively discharged because she "fails to demonstrate a…discriminatory work environment even more egregious than the high standard of a hostile work environment." [Filing No. 68 at 18-19.] FBF notes that it did not terminate Ms. Baugh and that it "even wanted her to stay on in another role with the company, such as the head of licensing after the businesses were combined and a replacement CEO was found," but that Ms. Baugh resigned instead. [Filing No. 68 at 19.]

In order to succeed on a retaliation claim under Title VII or the ADEA, Ms. Baugh must produce evidence from which a reasonable jury could conclude that: (1) she engaged in a statutorily protected activity; (2) she suffered an adverse employment action; and (3) there is a causal link between the protected activity and the adverse action. *Chatman v. Bd. of Educ. of City of Chi.*, 5 F.4th 738, 748 (7th Cir. 2021) (Title VII); *Lauth v. Covance, Inc.*, 863 F.3d 708, 716 (7th Cir. 2017) (ADEA). Title VII and the ADEA "share similar analytical approaches – *McDonell Douglas* [*v. Green*, 411 U.S. 792 (1973),] and *Ortiz* [*v. Werner Enterprises, Inc.*, 834 F.3d 760 (7th Cir. 2016)] – at summary judgment." *Igasaki v. Ill. Dep't of Fin. & Pro. Regul.*, 988 F.3d 948, 960 (7th Cir. 2021). Under *Ortiz* and its progeny, "the question for a retaliation claim should always be: 'Does the record contain sufficient evidence to permit a reasonable fact finder to conclude that retaliatory motive caused the discharge [or other adverse action]?'" *Id.* at 959 (quoting *Lord v. High Voltage Software, Inc.*, 839 F.3d 556, 563 (7th Cir. 2016)); *see also McDaniel v. Progress Rail Locomotive, Inc.*, 940 F.3d 360, 370 (7th Cir. 2019) ("[I]n retaliation cases [under the ADEA], we ask 'whether the evidence would permit a reasonable factfinder to conclude' that the plaintiff's age 'caused the discharge or other adverse employment action.'") (quoting *Ortiz*, 834 F.3d at 765). The parties do not dispute that Ms. Baugh satisfies the first element of a Title VII or ADEA retaliation claim – that she engaged in a protected activity when she filed the First Charge – so the Court goes on to consider whether she satisfies the second and third elements.

### 1. *Adverse Employment Action*

Ms. Baugh alleges that she suffered an adverse employment action because she was constructively discharged from FBF. In order to prevail on a claim of constructive discharge, Ms. Baugh must show "that [she] was forced to resign because [her] working conditions, from the

standpoint of the reasonable employee, had become unbearable." *Beverly v. Abbott Lab'ys.*, 107 F.4th 737, 745 (7th Cir. 2024) (quotation and citation omitted).  A claim of constructive discharge is assessed "from the viewpoint of a reasonable employee." *Ziccarelli v. Dart*, 35 F.4th 1079, 1091 (7th Cir. 2022).

The Seventh Circuit Court of Appeals has recognized two forms of constructive discharge: "when an employee resigns due to discriminatory harassment, and when an employer acts in a manner so as to have communicated to a reasonable employee that she will be terminated." *Beverly*, 107 F.4th at 745 (quotation and citation omitted).  In connection with her retaliation claim, Ms. Baugh relies only on the latter form of constructive discharge and focuses only on FBF's plan to hire a new CEO.[7]  [*See* Filing No. 63 at 31.]  For the latter form, Ms. Baugh must show that FBF's actions communicated to her that she "immediately and unavoidably [would] be terminated."  *Id.* at 746 (quotation and citation omitted).

Here, it is undisputed that FBF told Ms. Baugh in January 2019 that she would no longer be FBF's CEO after it merged with another company.  Although she continued to work for FBF for almost two more years, she was told again in the fall of 2021 that due to the merger between FBF and PRO, the hiring of a new CEO was imminent.  Shortly thereafter, in December 2021, Ms. Baugh resigned.  The Court finds that this sequence of events could lead a reasonable factfinder to conclude that FBF's actions communicated to Ms. Baugh that she would "immediately and unavoidably…be terminated," *id.*, and, consequently, that Ms. Baugh suffered an adverse employment action.

---

[7] While Ms. Baugh focuses on FBF's reassignment of her E-commerce duties to Mr. Smith in connection with her Title VII discrimination claims, she does not argue that the reassignment constituted a constructive discharge or otherwise supports her ADEA retaliation claim.

### 2. *Causal Link*

Ms. Baugh must then show that there is a causal link between the protected activity and the adverse action. *Chatman*, 5 F.4th at 748; *Lauth*, 863 F.3d at 716. "To establish causation, [a plaintiff] must 'offer evidence that a retaliatory motive was a "but-for cause of the challenged employment action."'" *Vavra v. Honeywell Int'l, Inc.*, 106 F.4th 702, 706 (7th Cir. 2024) (quoting *Lesiv v. Ill. Cent. R.R. Co.*, 39 F.4th 903, 915 (7th Cir. 2022)).

The sequence of events leading up to Ms. Baugh's resignation – even if it is considered to be a constructive discharge – dooms her retaliation claims. Ms. Baugh was told as early as December 2018 that FBF would be hiring a new CEO once it merged or was acquired. In September or October 2021, she was told more definitively that because FBF and PRO would be merging, a new CEO would be hired imminently. Ms. Baugh filed the First Charge after that, in November 2021. The Court finds that a reasonable jury could not conclude that FBF's actions in deciding to hire a new CEO and informing Ms. Baugh of that decision, even if that constituted a constructive discharge, were taken because she filed the First Charge. Indeed, that cannot have been the case because Ms. Baugh had not yet filed the First Charge when FBF took those actions.

Because Ms. Baugh cannot establish a causal link between a constructive discharge and the filing of the First Charge, her ADEA and Title VII retaliation claims fail as a matter of law and the Court **GRANTS** FBF's Motion for Partial Summary Judgment on those claims.

## B. Discrimination Claims

### 1. *ADEA Discrimination Claim*

As noted above, Ms. Baugh withdrew her discrimination claim under the ADEA in her Statement of Claims. [Filing No. 41 at 1 (Ms. Baugh stating that she "does not intend to proceed on her claim of age discrimination as contained in Count I") (emphasis omitted).] Accordingly,

the Court **DENIES AS MOOT** FBF's Motion for Partial Summary Judgment as it applies to Ms. Baugh's ADEA discrimination claim.

> 2. *Title VII Discrimination Claims*

Ms. Baugh sets forth Title VII discrimination claims based on a hostile work environment and disparate treatment.  The Court addresses each claim in turn.

> a.   Discrimination Claim Based on a Hostile Work Environment

In support of its Motion for Partial Summary Judgment, FBF argues that Ms. Baugh supports her hostile work environment claim with "contextless allegations that [Mr.] Morris treated [her] poorly."  [Filing No. 47 at 19.]  FBF acknowledges Mike Taglich's "blonde bombshell" comment, but asserts that it was made "at an event that was not a conference specific to FBF nor was it attended by employees," and that Ms. Baugh "did not have any other negative encounters with Mike Taglich at any other time." [Filing No. 47 at 19.]  It contends that "this one-time isolated comment about [Ms. Baugh's] appearance by a person who was not a Board member and/or employee of FBF would certainly not rise to a level of a hostile work environment." [Filing No. 47 at 19.]  Further, FBF argues that Mr. Morris's "conduct in asking the same question over and over, [and] saying that he hates her or the other disparaging remarks may constitute as rude, unpleasant and even annoying conduct," but do not rise to the level of severe or pervasive conduct needed for a hostile work environment claim.  [Filing No. 47 at 19.]  It also contends that excluding Ms. Baugh from playing golf after a Board meeting does not support a hostile work environment claim.  [Filing No. 47 at 19.]

In her response, Ms. Baugh argues that she was subjected to severe, pervasive, and frequent harassment, including the "blonde bombshell" comment, which caused her face to turn beet red and her to sweat, and for which she "had a hard time recovering and tried to cover it up," and "felt

awkward having to provide a professional CEO presentation to high-net-worth individuals after Mike Taglich had portrayed her as anything but an intelligent female CEO." [Filing No. 63 at 16.] Ms. Baugh points to Bobby Taglich apologizing for his brother's behavior before Mike Taglich had even said anything and notes that Mike Taglich is an FBF "[B]oard member and owner" and had "authority over Ms. Baugh." [Filing No. 63 at 16.] She argues that during Board meetings, Mr. Morris "frequently put [her] down, laughed at her[, and] would not allow her to participate in the meetings," "derided her efforts to legitimately and wisely advise the board," and told Ms. Baugh he "f***ing hated her" when she approached him with her concerns. [Filing No. 63 at 17.] Ms. Baugh contends that all Board members except her were invited to play golf after a Board meeting, that the E-commerce duties were reassigned to Mr. Smith, and that Mr. Smith received shares of FBF as an award for taking over the marketing division but Ms. Baugh did not receive shares of PRO or awards for taking on PRO's licensing responsibilities. [Filing No. 63 at 17-18.] She asserts that the harassment was severe and pervasive, occurred over an entire year, that it occurred at "quarterly board meetings that eventually turned into weekly meetings after [FBF] bought the assets of [PRO]," and that Mr. Morris treated her differently than other team members and Board members. [Filing No. 63 at 18.] Finally, Ms. Baugh argues that FBF "does not support any of [its] claims regarding [her] hostile work environment not being severe, pervasive and frequent with admissible evidence or citations to admissible evidence." [Filing No. 63 at 19.]

In its reply, FBF reiterates its argument that Mike Taglich's "blonde bombshell" comment was a "one-time isolated comment about [Ms. Baugh's] appearance by a person who was not a Board member and/or employee of FBF" and does not rise to the level of a hostile work environment. [Filing No. 68 at 10.] FBF also argues that Mr. Morris's conduct toward her may have been rude but was not severe or pervasive, and that not being invited to play golf after the

Board meeting was "an isolated and one time issue." [Filing No. 68 at 10-11.]  As for the decision to reassign E-commerce duties to Mr. Smith, FBF notes that "the [E-]commerce initiative was unprofitable under the leadership of [Ms.] Baugh, which was the reason for the transition," that the plan was for FBF and PRO to merge, that Mr. Smith had experience in E-commerce, and that the decision was "based purely on business decisions" and not "to humiliate or embarrass [Ms.] Baugh." [Filing No. 68 at 10-11.]

"A sexually hostile or abusive work environment is a form of sex discrimination under Title VII." *E.E.O.C. v. Mgmt. Hosp. of Racine, Inc.*, 666 F.3d 422, 432 (7th Cir. 2012).  To prevail on a hostile work environment claim under Title VII, a plaintiff must show that: "(1) her environment was both objectively and subjectively offensive, (2) the harassment she complained of was based on gender, (3) the conduct was so severe or pervasive as to alter the conditions of employment and create a hostile or abusive working environment, and (4) there is a basis for employer liability." *Anderson v. Street*, 104 F.4th 646, 652 (7th Cir. 2024) (quotation and citation omitted).

In determining whether a workplace is objectively hostile, a court considers "the totality of the circumstances," *Alamo v. Bliss*, 864 F.3d 541, 549 (7th Cir. 2017), including "the severity of the allegedly discriminatory conduct, its frequency, whether it was physically threatening or humiliating or merely offensive, and whether it unreasonably interfered with the employee's work performance." *Swyear v. Fare Foods Corp.*, 911 F.3d 874, 880 (7th Cir. 2018).  "[E]mployers generally do not face liability for off-color comments, isolated incidents, teasing, and other unpleasantries that are, unfortunately, not uncommon in the workplace." *Id.* at 881 (citation omitted).  Additionally, "occasional vulgar banter, tinged with sexual innuendo of coarse or boorish workers generally does not create a work environment that a reasonable person would find

- 22 -

intolerable." *Hilt-Dyson v. City of Chi.*, 282 F.3d 456, 463 (7th Cir. 2002) (quotation and citation omitted).  The Seventh Circuit Court of Appeals has instructed, however, that "[a] severe episode that occurs as rarely as once and a relentless pattern of lesser harassment both may violate Title VII" – there is no "magic number" of instances needed.  *Bliss*, 864 F.3d at 550 (quotations and citations omitted).

Ms. Baugh has pointed to multiple incidents that she claims interfered with her ability to perform her work as FBF's CEO.  First, Mike Taglich – the owner of the company that had just acquired FBF – introduced her as the "new blonde bombshell CEO" at the Investors Meeting in front of 250 people, which caused her to turn beet red, sweat, and have trouble recovering in order to do her presentation.  FBF relies on the fact that Mike Taglich was not a Board member or employee of FBF when he made the comment, but the Seventh Circuit has instructed that "it makes no difference whether the person whose acts are complained of is an employee, an independent contractor, or for that matter a customer[; a]bility to 'control' the actor plays no role [and] employers have an arsenal of incentives and sanctions…that can be applied to affect conduct." *Dunn v. Wash. Cnty. Hosp.*, 429 F.3d 689, 691 (7th Cir. 2005).

Ms. Baugh also bases her hostile work environment claim on Mr. Morris's treatment of her, including putting her down, laughing at her, not allowing her to participate in meetings, and dismissing her comments during Board meetings but then accepting the same information presented by males.  FBF concedes that Mr. Morris's behavior may have been "rude, unpleasant and even offensive," but maintains that it was not severe or pervasive and did not alter Ms. Baugh's conditions of employment.  [Filing No. 68 at 10.]  However, Ms. Baugh has presented evidence indicating that Mr. Morris's bullying and belittling was pervasive, repeated, and continued over a long period of time – including his treatment of her in front of PRO's Co-CEOs, accountant, Chief

Financial Officer, and marketing firm in a 2021 phone call in which he asked her to divulge confidential contract information; his treatment of her during an April 2021 call with PRO representatives when he questioned the information Ms. Baugh provided; and his asking Ms. Baugh the same questions over and over during frequent Board meetings, rejecting her answers, and then accepting the same answers when they were given by a male.  [*See* Filing No. 46-1 at 64-67; Filing No. 62-1 at 1-5.]

The Court finds particularly significant Ms. Baugh's testimony that Mr. Morris ignored the information Ms. Baugh presented during meetings, while crediting the same information when presented by a male.  This practice is known as "hepeating," which "describes the act of a man repeating and taking credit for a comment or idea that was…initially made by a woman [and] was ignored until it was repeated by the man." *A Seat at the Table: Perspectives on "Unexpected" Leadership in a Diverse and Evolving World*, 20190624 AHLA-SEM 51, AHLA Seminar Papers (June 24, 2019); *see also* collinsdictionary.com (last visited August 1, 2024) (defining "hepeating" as "[w]hen a woman's suggestion is overlooked, but then readily accepted when repeated by a man").  Hepeating "mak[es] the person of difference [– in this case, the woman –] less effective" and eventually causes them to "silence themselves and stop contributing to the discussion, which results in [other] management viewing them as incompetent or not a team player."  *A Seat at the Table: Perspectives on "Unexpected" Leadership in a Diverse and Evolving World*, 20190624 AHLA-SEM 51.  "This invalidation operates on one's self-confidence and self esteem." *Id.*  Ms. Baugh's evidence that she was subjected to "hepeating" over the course of her time as CEO from Mr. Morris could lead a reasonable jury to conclude that she was subjected to a hostile work environment based on her sex.  And evidence that she – the only female Board member – was the

only Board member not invited to play golf after a Board meeting is further evidence that she was ignored and marginalized due to her sex.

In short, Ms. Baugh has presented sufficient evidence from which a reasonable jury could conclude that she was subjected to sex discrimination based on a hostile work environment and the Court **DENIES** FBF's Motion for Partial Summary Judgment on that claim.

b.   Discrimination Claim Based on Disparate Treatment

In support of its Motion for Partial Summary Judgment, FBF argues that Ms. Baugh cannot establish a prima facie case of gender discrimination because she did not meet or exceed FBF's legitimate performance expectations as CEO following FBF's acquisition.  [Filing No. 47 at 20-21.]  It contends that under her leadership, FBF did not meet the financial goals Ms. Baugh had projected, she did not perform FBF's E-commerce business to the satisfaction of FBF's owners and Board, she did not work well with PRO's leadership (including Mr. Smith), she "proved to be difficult to work with," she "did not have the skills to perform all of the duties and responsibilities of CEO once FBF combined with the other business," and she "lacked the expertise in acquisitions to continue as the CEO [once] the merger was completed." [Filing No. 47 at 21.]  FBF also argues that Ms. Baugh was not subjected to an adverse employment action, either due to FBF's intent to hire a new CEO (as discussed above) or through the reassignment of FBF's E-commerce business to Mr. Smith.  [Filing No. 47 at 21-24.]  FBF contends that even if Ms. Baugh could establish a prima facie case of discrimination, FBF has articulated legitimate, non-discriminatory reasons for its actions – including that it reassigned the E-commerce responsibilities to Mr. Smith because Mr. Smith's company was an E-commerce company and E-commerce was a new endeavor for FBF. [Filing No. 47 at 24.]  Finally, it argues that Ms. Baugh "is unable to present any evidence that

shows that the reasons articulated by FBF for the actions taken with respect to her…were false and merely pretexts for gender discrimination." [Filing No. 47 at 26.]

In response, Ms. Baugh argues that she has a "long history of outstanding performance," including working with various sporting leagues on licensing issues and performing CEO duties in a satisfactory manner. [Filing No. 63 at 21-22.] She asserts that similarly situated male employees were treated more favorably than she was, including Mr. Smith, who was not replaced as PRO's CEO despite "his running [PRO] into the ground," but was still chosen by FBF to replace Ms. Baugh as head of marketing, assigned FBF's E-commerce duties, and appointed to FBF's Board. [Filing No. 63 at 23-24.] Ms. Baugh notes that while Mr. Morris had mentioned the possibility of her staying on in a licensing position with FBF, "there was never any offer that she would remain on [FBF's] board after she was replaced as CEO." [Filing No. 63 at 24.] Ms. Baugh asserts that her successor as CEO, Steve Smits, was paid $300,000 in salary with a bonus target of 60% of his base salary, compared to her $220,000 salary with a bonus target of 37.5% of her base salary. [Filing No. 63 at 24-25.] She argues further that material issues of fact remain regarding FBF's reasons for replacing her, as reflected by testimony from several Board members that Ms. Baugh was meeting legitimate performance expectations; the fact that no other Taglich-owned entities had female Board members; the fact that Ms. Baugh was replaced by a male as CEO; the fact that "[t]he financial projections for 2021 were not supportive of FBF's initial expectation to be in a position to sell in about 5 years," but that Ms. Baugh was replaced before any acquisition or sale and the search was "already going great thirty…days after Ms. Baugh filed [the First Charge]"; and the fact that FBF does not support any of its claims regarding Ms. Baugh's performance with admissible evidence. [Filing No. 63 at 25-27.]

In its reply, FBF reiterates its arguments that Ms. Baugh was not meeting legitimate performance expectations and that she did not suffer an adverse employment action. [Filing No. 68 at 12-14.] It argues that it has articulated legitimate, non-discriminatory reasons for both the reassignments of the E-commerce duties to Mr. Smith and the replacement of Ms. Baugh as CEO, that Ms. Baugh "is unable to present any evidence that shows that the reasons articulated by FBF for the actions taken with respect to her…were false and merely pretexts for gender discrimination," and that "[t]here is no question that she resigned her position and chose to move on from FBF." [Filing No. 68 at 14-15.]

Title VII forbids an employer from discriminating against any individual with respect to his or her "compensation, terms, conditions, or privileges of employment, because of such individual's…sex." 42 U.S.C. § 2000e-2(a)(1). To succeed on a discrimination claim based on disparate treatment under Title VII, the plaintiff must demonstrate: (1) that she is a member of a protected class; (2) that she suffered an adverse employment action; and (3) causation. *Lewis v. Ind. Wesleyan Univ.*, 36 F.4th 755, 759 (7th Cir. 2022). With respect to causation, Title VII requires the plaintiff to show that her sex was "a motivating factor in the defendant's challenged [employment] decision." *Comcast Corp. v. Nat'l Ass'n of African American-Owned Media*, 140 S. Ct. 1009, 1014 (2020) (quotation omitted).

"One way of proving employment discrimination is the familiar *McDonnell Douglas* burden-shifting framework." *Lewis*, 36 F.4th at 759 (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973)). Under that framework, to establish a prima facie case of discrimination, the plaintiff must show that: "(1) she is a member of a protected class, (2) she was meeting the defendant's legitimate expectations, (3) she suffered an adverse employment action, and (4) similarly situated employees who were not members of her protected class were treated

more favorably." *Lewis*, 36 F.4th at 759.  If the plaintiff establishes each element of the prima facie case, the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for the adverse action.  *Id.*  If the employer does that, the burden shifts back to the plaintiff to demonstrate that the employer's explanation is pretextual.[8]  *Id.*

Although "the well-known and oft-used *McDonnell Douglas* framework for evaluating discrimination remains an efficient way to organize, present, and assess evidence in discrimination cases," *Johnson v. Advoc. Health & Hosps. Corp.*, 892 F.3d 887, 894 (7th Cir. 2018), it "is not the only method plaintiffs may use to prove their claim," *McDaniel*, 940 F.3d at 368.  "However the plaintiff chooses to proceed, at the summary judgment stage the court must consider all evidence to decide whether a reasonable jury could find that the plaintiff suffered an adverse employment action because of [a protected characteristic]."  *Id.* at 368 (quotations, emphasis, and citations omitted).  "[T]he singular question that matters in a discrimination case" is 'whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action.'"  *Johnson*, 892 F.3d at 894 (quoting *Ortiz*, 834 F.3d at 765); *see also Igasaki*, 988 F.3d at 958 ("Under *Ortiz*, we therefore ask whether the totality of the evidence shows discrimination, eschewing any framework or formula.").  In answering this question, "[e]vidence must be considered as a whole, rather than asking whether any particular piece of evidence proves the case by itself."  *Ortiz*, 834 F.3d at 765.

---

[8] The Court notes that current Seventh Circuit precedent instructs that the *McDonnell Douglas* prima facie analysis may be skipped where "the employer raises the employee's performance as the reason for the adverse employment decision."  *Vichio v. US Foods, Inc.*, 88 F.4th 687, 691 (7th Cir. 2023).  "In such a case, issues of satisfactory performance and pretext overlap, allowing us to proceed directly to…pretext."  *Id.* (quotations and citations omitted).  This appears applicable here, but since the parties present arguments regarding the prima facie analysis, the Court addresses them for the sake of thoroughness.

The Court first considers whether Ms. Baugh has established a prima facie case of sex discrimination.  First, there is no dispute that she is a member of a protected class because she is a female.  Second, as to whether Ms. Baugh was meeting FBF's legitimate employment expectations, FBF claims that Ms. Baugh was not easy to work with, that her management style was difficult, and that the E-commerce initiative was considered a failure under her direction.  [Filing No. 47 at 10.]  But tellingly, it relies on its own Answers to Interrogatories to support its argument, not testimony from FBF management or other first-hand evidence, and it acknowledges in its Answers to Interrogatories that Ms. Baugh was never disciplined, reprimanded, or warned regarding any performance issues.  [Filing No. 46-2 at 10-11.]  Additionally, although FBF criticizes her E-commerce experience and performance, Ms. Baugh has submitted evidence that she had presented a proposal for E-commerce, that Mr. Smith presented the exact same proposal a month later, and that FBF increased its ad spending for E-commerce significantly based on Mr. Smith's submission of Ms. Baugh's proposal.  [Filing No. 62-2 at 44; Filing No. 62-5 at 42.]  While the Court may not weigh evidence on summary judgment, it finds that the evidence FBF has presented would not foreclose a reasonable jury from concluding that Ms. Baugh was, in fact, meeting FBF's legitimate expectations and that Ms. Baugh's evidence could, indeed, lead to that conclusion.  Third, the Court has already found in connection with Ms. Baugh's retaliation claim that a reasonable jury could conclude that Ms. Baugh was constructively discharged when she was informed that she would be replaced as CEO and, consequently, that she suffered an adverse employment action.  Finally, Ms. Baugh has presented evidence that similarly situated employees were treated more favorably than she was.  Specifically, Mr. Morris credited information provided by male Board members but discredited the same information when presented by Ms. Baugh, and Mr. Smits was paid a higher

salary and target bonus than she was when he was hired as CEO.  Ms. Baugh has presented

sufficient evidence to establish a prima facie case of sex discrimination.

As to FBF's reasons for constructively discharging Ms. Baugh, it focuses solely on Ms.

Baugh's performance but, as discussed above, the evidence upon which it relies leaves open

questions regarding whether her performance warranted discharge.  And evidence that Ms. Baugh

faced "hepeating" on a regular basis during meetings and that Mr. Smits was paid substantially

more than Ms. Baugh when he was hired as CEO could indicate to a reasonable jury that FBF's

stated reasons for constructively discharging Ms. Baugh were a pretext for discrimination and

"would permit a reasonable factfinder to conclude that [Ms. Baugh's] sex…caused the discharge."

*Johnson*, 892 F.3d at 894 (quotation and citation omitted).

Because Ms. Baugh has presented sufficient evidence from which a reasonable jury could

conclude that she was subjected to disparate treatment due to her sex, the Court **DENIES** FBF's

Motion for Partial Summary Judgment on her Title VII sex discrimination claim based on disparate

treatment.

## V.
### CONCLUSION

FBF downplays Ms. Baugh's evidence that she faced discrimination based on her sex when

Mike Taglich humiliated her in front of hundreds of people at a work-related event by introducing

her as the "new blonde bombshell CEO" and when Mr. Morris ignored and discredited her during

meetings and she was subjected to "hepeating," characterizing those incidents as one-time and

isolated.  But the Court considers the totality of the circumstances and these one-time incidents

add up, and are sufficient for a reasonable jury to conclude that Ms. Baugh faced discrimination

based on her sex both through a hostile work environment and through disparate treatment.  For

the foregoing reasons, the Court:

- **OVERRULES IN PART** and **SUSTAINS IN PART** Ms. Baugh's Objections to FBF's Statement of Disputed Material Facts as set forth above;

- **OVERRULES IN PART** and **SUSTAINS IN PART** FBF's Objections to Ms. Baugh's Statement of Additional Material Facts as set forth above;

- **GRANTS** FBF's Motion for Partial Summary Judgment, [46], on Ms. Baugh's ADEA and Title VII retaliation claims;

- **DENIES AS MOOT** FBF's Motion for Partial Summary Judgment, [46], on Ms. Baugh's ADEA discrimination claim; and

- **DENIES** FBF's Motion for Partial Summary Judgment on Ms. Baugh's Title VII sex discrimination claims based on a hostile work environment and disparate treatment.

No partial final judgment shall issue.

Ms. Baugh's claims for Title VII sex discrimination based on a hostile work environment and disparate treatment and her state law claims for violation of Ind. Code § 32-36-1-1, *et seq.* and invasion of privacy will proceed.  The Court requests that the Magistrate Judge confer with the parties as soon as practicable – if possible, before the September 5, 2024 final pretrial conference scheduled in this case – to discuss a possible resolution of the remaining claims short of trial.



Date: 8/2/2024

Hon. Jane Magnus-Stinson, Judge
United States District Court
Southern District of Indiana



**Distribution via ECF only to all counsel of record**